A98A1204. DEPARTMENT OF CORRECTIONS v. DERRY.

(510 SE2d 832)

POPE, Presiding Judge.

Wayne Correctional Institution Officer Ernest Roberson filed a disciplinary report against inmate Troy Bostic for failing to wear a belt to a meal, as required by prison regulations, and for cursing when Officer Roberson confronted him about the belt. After the report was filed, inmate Bostic asked Corrections Officer Gregory Derry, who had seen the incident regarding the belt, whether he thought Officer Roberson was harassing Bostic. Officer Derry told Bostic that he did believe that Officer Roberson was harassing him. Based on his statements to the inmate, Derry was terminated from his position as a correctional officer for violating Department of Corrections (DOC) and Wayne prison rules prohibiting officers from engaging in personal conversations with inmates and from criticizing other officers in front of inmates. Derry appealed his termination to the State Personnel Board, which upheld the termination. Derry next appealed to superior court. The court reversed the board's ruling, finding that the inmate's due process rights to defend himself against the disciplinary report filed by Officer Roberson authorized Derry's comments to the inmate. We granted the DOC's application for discretionary review and reverse the superior court's decision.

1. The court based its decision on OCGA § 45-20-9 (m) (1), which provides that a court may reverse the decision of the board if substantial rights *of the petitioner* have been prejudiced because the board's decision violates constitutional or statutory provisions. The court's rationale under this Code section was erroneous. The court reasoned that the board's decision to dismiss Derry violated the inmate's due process rights to defend himself in the disciplinary action taken against him. As the words emphasized above indicate, the court may only reverse the board's decision if the rights of the petitioner, in this case the rights of Derry, have been prejudiced. The Code section does not authorize the court to reverse the board's decision based on the rights of a third-party inmate.

Moreover, we disagree with the court's finding that the DOC prohibitions against an officer engaging in personal conversations

with an inmate and criticizing another officer in front of an inmate somehow abridge the inmate's ability to defend himself in a prison disciplinary action. There is evidence in the record of the procedures to be followed in a disciplinary action, and those procedures allow an inmate to call an officer as a witness at the disciplinary hearing. In fact, the inmate involved in the instant case named Derry as a witness and Derry testified on the inmate's behalf at the disciplinary hearing. Thus, the enforcement of the DOC regulations, which help ensure the security of both prison officials and inmates, did not prejudice the inmate's rights.

Nevertheless, even if the inmate's due process rights were violated by the dismissal of Derry for breaching DOC regulations against having a personal conversation with an inmate, that violation would not provide a legal basis under OCGA § 45-20-9 (m) (1) for reversing the board's decision. The court could have reversed the board's decision under that Code section only if it found that the decision prejudiced Derry's rights. Because the court made no such finding and instead based its ruling on the erroneous legal analysis that the due process rights of an inmate warranted the reversal of the board's decision to dismiss Derry, the court's ruling cannot stand. See generally *Dept. of Corrections v. Shaw*, 217 Ga. App. 33, 35-36 (2) (456 SE2d 628) (1995); *Dept. of Transp. v. Nobles*, 187 Ga. App. 244 (370 SE2d 11) (1988).

2. The dissent contends that Derry's improper comments to inmate Bostic cannot be condemned because there are no DOC or Wayne Correctional Institution rules prohibiting a prison guard from engaging in a private conversation with a prison inmate in which the guard criticizes another prison officer's job performance. While the rules in question do not specifically state that an officer shall not criticize another officer in front of an inmate,[1] the general conduct prohibited by the rules covers such inappropriate criticism of an officer in the presence of an inmate.

The DOC Rules, Chapter 125-2-1-.07 (d), provide: "Employees shall not, without the express written approval of the appropriate Deputy Commissioner, maintain personal association with, engage in personal business or trade with, or engage in non-job related correspondence with, or correspond in behalf of or for, known inmates. . . ."

---

[1] When Derry joined the Wayne Correctional Institution staff he signed the DOC Code of Ethics, which did expressly prevent an officer from criticizing another officer in front of an inmate. Section 25 of that Code provided: "Institution business affairs, security policy and procedures, and other staff performance shall not be criticized, condemned or otherwise discussed with an inmate." Apparently this Code was replaced by the prison's Standards of Conduct and General Post Orders.

Additionally, the Wayne Correctional Institution General Post Orders instruct officers: "Do not establish personal friendships with any inmate. . . . Never become engaged in conversations with inmates that involve the low rating of the Administration or any communications that might be regarded as relating security information to inmates. Act as an authority figure, not a friend. If you are ever in doubt as to the validity of an inmate's statement, check it out with your supervisor."

Moreover, the back of Derry's officer identification card expressly provides: "THERE SHALL BE NO PERSONAL OR BUSINESS DEALING WITH INMATES, PROBATIONERS, OR PAROLEES."

Contrary to the dissent's contention, Derry's criticism of Officer Roberson's job performance during a private conversation with inmate Bostic is a personal communication that compromised the security of the prison by appearing to pit one officer against another. As the charge against Derry asserted: "In involving yourself in a personal conversation with an inmate in which you revealed information involving a fellow officer you violated the Department's prohibition against interpersonal dealings with an inmate and, thereby, breached the security of Wayne C.I., compromised your ability to supervise inmates effectively, and jeopardized the safety and welfare of yourself as well as other employees and inmates." We cannot join in the dissent's attempt to substitute its judgment for that of the prison and DOC officials, who determined that under their own policies Derry's criticism of Officer Roberson was an improper personal association with an inmate.

3. In the alternative, the dissent concludes that even if Derry violated DOC and prison policy, his private conversation with the inmate about another prison guard's job performance is protected speech under the First Amendment.[2] We disagree and believe that the dissent's conclusion and the First Amendment analysis supporting it are incorrect.

In relying on the First Amendment to uphold the trial court's ruling, the dissent ignores the fact that the trial court made no mention of the First Amendment in its ruling. As noted in Division 1 of this opinion, the sole basis for the court's reversal of the board's decision was the purported violation of the inmate's due process rights. The court made absolutely no finding concerning Derry's free speech rights. Thus, contrary to the dissent's claims, the First Amendment provides no basis for finding that the court's conclusions of law were

---

[2] "The First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech. . . .' U.S. Const. amend. I. This right was made applicable to the states by the Fourteenth Amendment. *Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 507-508, 91 L.Ed. 711 (1947)." *Morgan v. Ford*, 6 F3d 750, 753, n. 4 (11th Cir. 1993).

correct. Instead, as discussed in Division 1, the court's conclusions that the inmate's due process rights were violated and that such violation allows for a reversal of the board's decision under OCGA § 45-20-9 (m) (1) are incorrect as a matter of law.

(a) Even if we could say that the trial court concluded, like the dissent, that the state violated Derry's free speech rights by discharging him, such a conclusion would be erroneous. "Although the law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the first amendment, a public employee's right to freedom of speech is not absolute. In *Pickering*,[3] the landmark case concerning a public employee's first amendment rights, the Supreme Court held that a public employee's interests are limited by the state's need to preserve efficient governmental functions. The state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the employee as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." (Citations and punctuation omitted; footnote supplied.) *Bryson v. City of Waycross*, 888 F2d 1562, 1565 (V) (11th Cir. 1989).

"[A] four-stage analysis has evolved. First, the court must determine if the employee's speech may be fairly characterized as constituting speech on a matter of public concern. Second, if the speech addresses a matter of public concern, the court must then conduct a balancing test in which it weighs the First Amendment interests of the employee against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. Third, if the employee's claim survives the balancing test, the fact-finder must determine whether the employee's speech played a substantial part in the government's decision to discharge the employee. Finally, if the fact-finder determines that the employee's speech played a substantial part in the employee's discharge, the state must prove by a preponderance of the evidence that it would have discharged the employee even in the absence of the speech." (Citations and punctuation omitted.) *Smith v. Upson County, Ga.*, 859 FSupp. 1504, 1510-1511 (M.D. Ga. 1994), aff'd, 56 F3d 1392 (11th Cir. 1995). In the instant case, any free speech claim by Derry does not survive the first two stages of the analysis and therefore we do not reach stages three and four.

(b) In determining the threshold issue, whether the employee's

---

[3] *Pickering v. Bd. of Ed.*, 391 U. S. 563 (88 SC 1731, 20 LE2d 811) (1968).

speech may be fairly characterized as constituting speech on a matter of public concern, the court examines the content, form and context of the employee's speech. *Bryson v. City of Waycross*, 888 F2d at 1565. The dissent, in making such an examination, claims that "[h]arassing an inmate is wrongdoing by a correctional officer and thus a matter of public concern." Three of the cases cited by the dissent reveal the error in the dissent's claim.

The content and context of the challenged speech in each of the three cases are factually distinguishable from the content and context of Derry's speech. In *Cooper v. Smith*, 89 F3d 761 (11th Cir. 1996), the court found that a Camden County deputy sheriff's statements to the Georgia Bureau of Investigation, which was investigating corruption in the Camden County Sheriff's Department, involved a matter of public concern. In *Fikes v. City of Daphne*, 79 F3d 1079 (11th Cir. 1996), the court held that a police officer's reports to the Alabama Bureau of Investigation of alleged police misconduct (i.e., failure to terminate a dangerous, high-speed chase, and improper use of a confiscated vehicle) involved a matter of public concern. In *Tindal v. Montgomery County Comm.*, 32 F3d 1535 (11th Cir. 1994), the court found that the testimony of a sheriff's employee about the working environment in the sheriff's office, given under subpoena at a sexual harassment trial, involved a matter of public concern.

In the three cited cases, the content of the public employees' speech involved facts; the employees reported actions and described events they had observed. The content of Derry's speech, however, does not involve facts; Derry did not describe events to the inmate, but instead expressed his personal opinion about another officer's job performance. See *Hansen v. Soldenwagner*, 19 F3d 573, 577-578 (11th Cir. 1994). Furthermore, in *Cooper* and *Fikes* the speech was made in the context of reports to state investigative authorities, and in *Tindal* the context of the speech was testimony made under subpoena in a federal jury trial. Unlike those cases, Derry did not speak in any such official context; rather, he spoke in a private conversation with a prison inmate, giving his critical opinion of another officer to the inmate. Given the content and context of Derry's speech, the cases relied on by the dissent do not support the finding that Derry spoke on a matter of public concern, and in fact support the opposite finding that Derry's personal opinion was not a matter of public concern.

While we agree with the dissent that harassment of prison inmates is a matter of societal interest, "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." (Citations and punctuation omitted.) *Morgan v. Ford*, 6 F3d at 754. Instead, "[a] court must . . . discern the purpose of the employee's speech — that is, whether

[he] spoke on behalf of the public as a citizen, or whether the employee spoke for [himself] as an employee. . . . A court may consider the employee's attempts to make the concerns public, along with the employee's motivation in speaking." (Citations, punctuation and footnote omitted.) Id. In the instant case, Derry was not attempting to make his opinion about another officer public by giving that opinion to an inmate in a private conversation. Based on the context and content of Derry's speech, it is apparent that his purpose was not to speak on behalf of the public, but was to speak for himself by giving his personal opinion.

(c) Nevertheless, even if Derry's opinion could be considered a matter of public concern, his interest in expressing that opinion does not survive the *Pickering* balancing test. "Since *Pickering* the balance has been struck more often than not in favor of the employer's interests in efficiency, and the employee[']s interest has been reduced to a particularly narrow interpretation of 'public concern.' [Cit.] The magnitude of the State's interest has been given [special] emphasis in the context of dismissals from police, fire departments and other emergency-related positions. In particular, the importance of a close working relationship in such situations, and the possible destruction of that relationship by the employee[']s speech, has been seen as grounds for upholding termination regardless of the 'public concern' quality of the employee[']s speech." *Abernathy v. City of Cartersville*, 642 FSupp. 529, 533 (N.D. Ga. 1986).

"We must consider several factors in balancing the state's interest in efficient provision of public services against [Derry's] speech interest, including: (1) whether the *speech at issue* impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made. [Cits.]" (Punctuation omitted; emphasis in original.) *Bryson v. City of Waycross*, 888 F2d at 1567. In determining whether Derry's speech impeded the DOC's ability to perform its duties in running a prison efficiently, we must examine "whether the statement impairs discipline by superiors or harmony among co-workers, or has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary. [Cit.]" (Punctuation omitted.) Id.

Personal loyalty and confidence between prison officers are certainly necessary for the safe and efficient running of a prison, where a relatively small number of officers must try to control a larger population of prisoners. "It is well established that states have a compelling interest in security and order within their prisons. [Cits.]" *Lawson v. Singletary*, 85 F3d 502, 512 (11th Cir. 1996). "There are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison envi-

ronment, which, by definition, is made up of persons with a demonstrated proclivity for antisocial[,] criminal, and often violent, conduct. . . . Prison administrators have not only an interest in ensuring the safety of prison staffs and administrative personnel, but also the duty to take reasonable measures for the prisoners' own safety." (Citations and punctuation omitted.) *Washington v. Harper*, 494 U. S. 210, 225 (110 SC 1028, 108 LE2d 178) (1990).

"Order and morale are critical to successful police work: a police department is a paramilitary organization, with a need to secure discipline, mutual respect, trust and particular efficiency among the ranks . . . different from other public employers. More so than the typical government employer, the [Department of Corrections] has a significant government interest in regulating the speech activities of its officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." (Citations and punctuation omitted.) *Hansen v. Soldenwagner*, 19 F3d at 577.

In the current case, the DOC's significant interest in prohibiting prison officers from criticizing each other in front of inmates in order to promote safety and efficiency, foster loyalty to other officers, and maintain morale was greatly compromised by Derry's conduct. As the warden of the Wayne Correctional Institution testified, a prison officer should not give a critical opinion about another officer to an inmate because it "could compromise the safety and security of the institution." He explained: "It could — inmates could manipulate staff, and they have done so in the past, into introducing contraband into the institution, or it could very well pit staff against staff, and another staff member could be viewed as an ally, and that's always inappropriate." A correctional sergeant at the Wayne prison also testified that a prison is a very dangerous environment and that Derry's comments to the inmate could have led to violence against another officer by making the inmate think that Derry was on his side and against the other officer. "It is not difficult to see how [Derry's] behavior . . . could cause serious disciplinary problems, undermine employee morale, and impair harmony among co-workers. Indeed, it is difficult to imagine how it could do anything else." *Morris v. Crow*, 117 F3d 449, 458 (11th Cir. 1997).

"Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (Citation and punctuation omitted.) *Ruble v. King*, 911 FSupp. 1544, 1554 (N.D. Ga. 1995). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." (Citation and punctuation omitted.) *Zimmer-*

*man v. Cherokee County*, 925 FSupp. 777, 782 (N.D. Ga. 1995).

Here, the DOC's decision to discharge Derry for violating regulations against officers engaging in personal conversations with inmates and criticizing other officers in front of inmates must be accorded wide-ranging deference because that decision and those regulations help maintain the officers' close working relationships and the security in the prison. See *Hodnett v. City of Atlanta*, 145 Ga. App. 285 (243 SE2d 605) (1978) (police regulation prohibiting officers from communicating official information to anyone who is not a member of the police bureau held to be reasonable in order to maintain police discipline and efficiency); *Aycock v. Police Committee*, 133 Ga. App. 883 (212 SE2d 456) (1975) (police regulation forbidding officers from criticizing the official acts of superior officers found to be reasonable in order to maintain good order, discipline and efficiency within police department).

Giving such deference to the decision and considering all the circumstances of this case, we conclude that the DOC's interest in the safe and efficient running of the prison greatly outweighs Derry's interest in expressing his personal and critical opinion about another officer in front of a prison inmate. See *Morris v. Crow*, 117 F3d 449 (sheriff's interest in promoting efficiency of his administration outweighs employee's interest in criticizing one of her superiors at a polling place); *Bryson v. City of Waycross*, 888 F2d 1562 (city's interest in assuring efficient police protection outweighs officer's interest in reporting misconduct by police chief); *Smith v. Upson County*, 859 FSupp. 1504 (sheriff department's interest in providing efficient public services outweighs officer's interest in reporting superior's conduct to outside investigators). Because the state's interest in the efficient running of its prisons outweighs Derry's speech interest, the discharge of Derry did not violate his First Amendment rights.

*Judgment reversed. Andrews, C. J., McMurray, P. J., Ruffin and Eldridge, JJ., concur. Beasley, J., dissents. Blackburn, J., not participating.*

BEASLEY, Judge, dissenting.

I respectfully dissent. Not only did Derry not violate any published policy of the Department of Corrections or the prison, but even if his brief response to Bostic had, it was protected First Amendment speech.

Derry, a correctional officer at Wayne prison, observed fellow officer Roberson ask inmate Bostic why he showed up to lunch without his belt. Bostic stated it was lost. Known as an "aggressive" officer, Roberson threatened that if the belt were found in Bostic's belongings, he would write him up. When a search of the belongings turned up no belt, Roberson filed a disciplinary action against Bostic

anyway. Feeling Roberson was harassing Bostic, Derry followed procedure by reporting his observations to the shift supervisor, who stated he would handle the matter. The supervisor did nothing.

Preparing his defense to the disciplinary charge, Bostic approached Derry to determine if he agreed with Bostic that Roberson's actions were harassment. Derry responded truthfully that he agreed, and the conversation ended. Once the Department assigned an investigator to the matter, Bostic informed him of the conversation with Derry. The investigator did not ask Derry about it, although he included the comment in his report to the same shift supervisor who had ignored Derry's report of the harassment. Derry was not named as a witness for the upcoming disciplinary hearing.

During the disciplinary hearing, Bostic informed the hearing officer of the conversation with Derry. The hearing officer suspended the proceedings until Derry arrived at work that day and then called him in to testify, whereupon Derry confirmed the conversation. In the written statement he was later asked to prepare, he included that he reported all this to the shift supervisor. Based on Derry's testimony, the hearing officer reduced the charge against Bostic and issued a verbal warning only.

But the matter was not over for Derry. The hearing officer reported the testimony to Derry's superior, who terminated Derry for violating the Department's prohibition against correctional officers having interpersonal dealings with inmates. Arguing that he had not violated any rule and that his First Amendment rights were being violated, Derry appealed to the State Personnel Board, which affirmed the termination. Wayne County Superior Court reversed on different constitutional grounds, holding that since the inmate had a right to gather information (just as does the investigating officer) to meet the disciplinary report that had been lodged against him, so too the witness had a correlative right to answer truthfully when asked his opinion of what he witnessed. Such a response could not be prohibited as "personal association" with an inmate because it related to the fair operation of the prison. This Court accepted discretionary review.

1. A superior court reviewing the actions of the State Personnel Board follows OCGA § 45-20-9 (m), which provides: "The review shall be conducted by the court without a jury and shall be confined to the record. The court shall not substitute its judgment for that of the board as to the weight of the evidence on questions of fact. The court may affirm the decision or order of the board or remand the case for further proceedings. The court may reverse the decision or order of the board if substantial rights of the petitioner have been prejudiced because the board's findings, inferences, conclusions, decisions, or orders are:

"(1) In violation of constitutional or statutory provisions;

"(2) In excess of the statutory authority of the board;

"(3) Made upon unlawful procedure;

"(4) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

"(5) Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion."[4]

The court reversed, holding the Board's decision violated the inmate's due process rights to investigate and Derry's correlative right to respond truthfully. The judgment should be affirmed because Derry violated no rule and if he did, his termination violated his constitutional right of free speech. "[A] trial court's ruling will be affirmed if it is right for any reason."[5]

2. The Board's conclusion that Derry violated a Department rule or regulation is clearly erroneous in view of the reliable, probative, and substantial evidence of record. The charge against Derry read: "In involving yourself in a personal conversation with an inmate in which you revealed information involving a fellow officer you violated the Department's prohibition against interpersonal dealings with an inmate. . . ."

In making regulations, the Department necessarily must consider "the State's interests in prison safety and security."[6] The regulation that Derry allegedly violated provides: "Employees shall not, without the express written approval of the appropriate Deputy Commissioner, maintain personal association with, engage in personal business or trade with, or engage in non job-related correspondence with, or correspond in behalf of or for, known inmates, active probationers, or parolees."[7]

This regulation does not prohibit conversations between inmates and correctional officers. The Department's own witnesses and documents affirmed that correctional officers are expected to converse with inmates on matters of prison business. The focus of this rule is to prevent personal or business associations or dealings between inmates and correctional officers, and to keep written communications with inmates restricted to prison business.

Derry responded to Bostic about an incident that Derry had witnessed and that had resulted in a disciplinary charge against Bostic, a matter of prison business. This was not a personal or business association or dealing, nor was it an interchange of written communica-

---

[4] See *State Personnel Bd. v. Morton*, 198 Ga. App. 845, 847 (1) (403 SE2d 455) (1991).

[5] (Citations and punctuation omitted.) *Holland v. State*, 232 Ga. App. 284, 285 (2) (501 SE2d 829) (1997).

[6] *Washington v. Harper*, 494 U. S. 210, 223 (110 SC 1028, 108 LE2d 178) (1990).

[7] OCRR § 125-2-1-.07 (d).

tions about non-prison business. The Board clearly erred in concluding this conversation violated the regulation.

In its decision the Board cited a statement found on the back of Derry's identification card, in which he agreed to "no personal or business dealing with inmates. . . ." Derry's conversation was not a business dealing nor a personal dealing with Bostic. It was a conversation related to the charge filed against Bostic, who was quite properly preparing his defense by talking with a witness to the incident.

The Board further quoted from a Code of Ethics, which prohibited correctional officers from discussing, condemning, or criticizing other staff performance or institutional business affairs with an inmate. The Board and the majority opinion focus on this prohibition in finding that Derry violated policy. But the Department twice conceded during the proceedings below that this Code of Ethics had been superseded by the prison's Standards of Conduct and General Post Orders, both of which documents predated the incident and neither of which contained a similar prohibition. At most the General Post Orders prohibited conversations with inmates "that involve the low rating of the Administration. . . ." But the term "administration" generally refers to the executive management of an institution, not the day-to-day dealings between front-line officers and inmates.[8] And in these particular post orders not only is the term capitalized, indicating a body of executive management, but the final page of the orders confirms that administration refers to the warden and other executives who manage the prison. It does not refer to a fellow correctional officer.

Derry cannot be condemned for violating a superseded Code of Ethics, and he did not violate the then-current policies of the Department or of the prison.

3. Even if Derry's conversation could be considered a violation of policy, Derry raised at every stage of the proceedings below that such would violate his federal First Amendment right to free speech. He has reasserted that argument here.

"A state may not demote or discharge a public employee in retaliation for protected speech. [The Eleventh Circuit] has developed a four-part test to determine whether an employee suffered such retaliation. First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the district court must weigh the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. Should the employee prevail on the bal-

---

[8] See Black's Law Dictionary (5th ed.), p. 41 (1979).

ancing test, the fact-finder determines whether the employee's speech played a substantial part in the government's decision to demote or discharge the employee. Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct."[9]

It is undisputed that the reason Derry was terminated was his brief conversation with Bostic. The Department made no claim that it would have terminated Derry absent the statement. Thus, only the first two factors are at issue here. Both issues are a question of law to be determined de novo by this Court.[10]

To determine whether the speech touches a matter of public concern requires "examining the content, form and context of the speech."[11] "The courts have consistently recognized statements that relate to actual or potential wrongdoing of a public official . . . as involving matters of public concern. See *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989); *Morales v. Stierheim*, 848 F.2d 1145 (11th Cir. 1988) [cits.]; *Eiland[ v. City of Montgomery*, 797 F2d 953, 956-957 (11th Cir. 1986)]."[12] Indeed, "a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption."[13] Further, statements that do not advance an employee's personal self-interest but the interests of others are speech that touches upon a public concern.[14] Helpful in this analysis is whether the employee "spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee."[15] Statements made in response to legitimate investigations fall in the public concern/citizen arena.[16]

Harassing an inmate is wrongdoing by a correctional officer and thus a matter of public concern. Derry followed prison procedure in immediately reporting this matter to his superior. Derry did not vol-

---

[9] (Citations and punctuation omitted.) *Morgan v. Ford*, 6 F3d 750, 753-754 (11th Cir. 1993); see *Rankin v. McPherson*, 483 U. S. 378 (107 SC 2891, 97 LE2d 315) (1987); *Pickering v. Bd. of Ed.*, 391 U. S. 563, 568 (88 SC 1731, 20 LE2d 811) (1968); *Bryson v. City of Waycross*, 888 F2d 1562, 1565-1566 (11th Cir. 1989).

[10] *Watkins v. Bowden*, 105 F3d 1344, 1353 (11th Cir. 1997); *Waters v. Chaffin*, 684 F2d 833, 837, n. 10 (11th Cir. 1982).

[11] (Citations omitted.) *Cooper v. Smith*, 89 F3d 761, 765 (11th Cir. 1996).

[12] *Johnson v. Waters*, 970 FSupp. 991, 999 (M.D. Ala. 1997); see *Abernathy v. City of Cartersville*, 642 FSupp. 529, 533 (N.D. Ga. 1986).

[13] *Bryson*, supra, 888 F2d at 1566; *Fikes v. City of Daphne*, 79 F3d 1079, 1084 (11th Cir. 1996); see *Cooper*, supra, 89 F3d at 765.

[14] *Tindal v. Montgomery County Comm.*, 32 F3d 1535, 1540 (11th Cir. 1994); see *Cooper*, supra, 89 F3d at 765-766; *Morgan*, supra, 6 F3d at 754-755.

[15] (Citations omitted.) *Morgan*, supra, 6 F3d at 754.

[16] *Cooper*, supra, 89 F3d at 765; *Fikes*, supra, 79 F3d at 1083-1084.

unteer this information to the inmate but only responded to a routine investigation by the inmate to prepare his defense on the charge brought by the offending officer. Derry's statement in no way advanced his personal interest, but was a truthful reply that placed him at odds with a colleague. Derry was speaking on a matter of public concern.

4. The second test weighs the employee's first amendment interests against the interest of the state (as an employer) in promoting the efficiency of the public services it performs through its employees.[17] "We must consider several factors . . ., including: (1) whether the *speech at issue* impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made."[18]

*Bryson* found the employee's interests were outweighed where a policeman made repeated bitter comments about the police chief to all who would listen in the department.[19] Such speech was indisputably disruptive and impeded the government's ability to perform its duties efficiently, as it severely undermined morale, created disharmony, and caused some officers to skirt the police station to avoid confrontation. Similarly, in *Morris v. Crow*[20] and *Hansen v. Soldenwagner*[21] the speech, though it concerned a public matter, was broadcast by the employee in such an abusive, vulgar, and obnoxious manner that the government's provision of efficient services was severely impeded.

Such is not the case here. As in *Tindal,*[22] there is no evidence that Derry's statement in fact inhibited either his work or the work of the prison. His single truthful response to an inmate's question regarding an incident for which he faced discipline and to which Derry was a witness did not disrupt the security of the prison. Instead, it facilitated the discovery of the truth at the hearing on that charge.

The superior court's judgment is correct.

DECIDED DECEMBER 4, 1998 ▮

*Thurbert E. Baker, Attorney General, Jeffrey L. Milsteen, Deputy Attorney General, Susan L. Rutherford, Dennis R. Dunn, Senior*

---

[17] *Bryson*, supra, 888 F2d at 1565.
[18] (Citations and punctuation omitted; emphasis in original.) Id. at 1567; *Fikes*, supra, 79 F3d at 1084.
[19] Supra, 888 F2d at 1567.
[20] 117 F3d 449, 458 (11th Cir. 1997).
[21] 19 F3d 573, 577-578 (11th Cir. 1994).
[22] Supra, 32 F3d at 1540.

*Assistant Attorneys General, Bryan K. Webb, Assistant Attorney General*, for appellant.