**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and MERCIER, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 24, 2017**

# In the Court of Appeals of Georgia

A17A0722. ATWATER et al. v. TUCKER.

MERCIER, Judge.

Kelly H. Tucker (a middle school teacher), filed a complaint for damages pursuant to 42 USC § 1983 against Patrick Atwater, Jr. (the Superintendent of Tift County Public Schools), and Kim Rutland, (the Chairperson of the Tift County Board of Education), alleging that they violated her constitutional right to free speech by suspending her for five days and requiring her to attend diversity training after she posted a particular comment on a social media website.[1] Atwater and Rutland filed a "Motion for Judgment on the Pleadings or in the Alternative Motion to Dismiss with Prejudice" asserting, inter alia, that they were entitled to official and sovereign

---

[1] Tucker also asserted claims against other defendants, but those claims are not relevant to this appeal.

immunity. The trial court considered the pleadings, arguments, affidavits and transcript of the suspension hearing and, expressly treating the motion as one for summary judgment, denied the motion. We granted Atwater's and Rutland's application for interlocutory appeal. For the reasons that follow, we reverse the judgment of the trial court.

"[B]ecause the trial court considered matters outside the pleadings, the motion [for judgment on the pleadings] was converted to one for summary judgment." *Sims v. First Acceptance Ins. Co. of Ga., Inc.*, 322 Ga. App. 361, 363 (3) (a) (745 SE2d 306) (2013) (citation omitted). "[S]ummary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Navy Fed. Credit Union v. McCrea*, 337 Ga. App. 103, 105 (786 SE2d 707) (2016) (punctuation and footnote omitted). "On appeal from the grant of summary judgment, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences." *Nyugen v. Southwestern Emergency Physicians, P. C.,* 298 Ga. 75, 82 (3) (779 SE2d 334) (2015).

So construed, the evidence shows the following. During the 2014-2015 school year, Tucker was employed as a middle school teacher in the Tift County Public

School System; the school system was managed by the Tift County Board of Education ("the Board"). On December 6, 2014, a Christmas parade was held in Tifton, Georgia, at which demonstrators displayed signs that read "Black Lives Matter," in what was "commonly known as a 'Ferguson protest.'" A local radio show host posted a question on Facebook regarding the appropriateness of the demonstration. Tucker posted a comment in response to the question, then engaged in a "posting dialogue" with another person. As part of that dialogue, Tucker posted the following public comment on Facebook, which comment precipitated the underlying disciplinary proceeding:

> It's turned into a race matter. What about the thugs that beat the father in his vehicle because he didn't slow down. What about the thugs that shot the college baseball player because they were bored. The list can go on and on. If the dude hadn't have stolen [sic], he would be alive. I think the signs should read, TAKE THE HOOD OFF YOUR HEAD, AND PULL UP YOUR DANG PANTS, AND QUIT IMPREGNATING EVERYBODY. I'm tired of paying for these sorry *&^ thugs...I would much rather my hard earned money that the government takes go to people who need it, such as abusive [sic] adults and children, not to mention the animals they beat and fight too...That's all I'm saying...[.]

3

Tucker's comment (the "post") "went viral," and many people in the community saw, shared, forwarded, and discussed the post. On about December 8, 2014, several individuals contacted Atwater to express concern about Tucker's post, including a Board member, a high school student, and a county commissioner. The commissioner expressed her concern and her constituents' concern that "a teacher . . . would post such a message." Later that month, several other individuals contacted Atwater and expressed their concerns about the post; some parents requested that their children be removed from Tucker's class; and several teachers and administrators at the school where Tucker taught lodged complaints with the school principal regarding the post.

In January 2015, Atwater issued a letter to Tucker notifying her that he was recommending to the Board that she be suspended for ten days and receive diversity training because of the post, and notifying her that a hearing would be held on the matter. Atwater wrote that Tucker had posted "an offensive message . . . which went viral." Atwater wrote that "[t]hese stereotypes [in the post] . . . are highly offensive to the African American community, and to members of our community as a whole"; that Atwater received complaints about the post from several of Tucker's colleagues, members of the community, former students, and parents; that her message "is very

4

disturbing to [her] African American colleagues, students, and [her] student's parents and is disruptive to the educational environment at [the school]"; that Tucker's posting of the comment demonstrated "a lack of professional judgment" and "an inappropriate attitude toward" her students; that Tucker violated Board policies and Standard 10 of the Georgia Code of Ethics for Educators;[2] and that disciplinary charges were being brought pursuant to OCGA § 20-2-940.[3]

The Board held a hearing at which Tucker and various school administrators, teachers, and parents testified. See OCGA § 20-2-1160 (a) (regarding the authority of county boards of education to conduct hearings). The testimony included the following: witnesses interpreted the post as referring to and "stereotyping" or unfairly characterizing African-American males; a parent requested to have her child removed from Tucker's class; several people brought copies of the post to the assistant

---

[2] Standard 10 provides: "An educator shall demonstrate conduct that follows generally recognized professional standards and preserves the dignity and integrity of the teaching profession. Unethical conduct includes but is not limited to any conduct that impairs and or diminishes the certificate holder's ability to function professionally in his or her employment position or behavior or conduct that is detrimental to the health, welfare, discipline, or morals of students." The Code was in the Employee Handbook for the Tifton County Public School System; Tucker had received a copy.

[3] OCGA § 20-2-940 (a) sets forth grounds for terminating or suspending teachers' employment contracts. Grounds enumerated include: (2) insubordination, (3) wilful neglect of duties, (4) immorality, and (8) any other good and sufficient cause.

5

principal and sought to involve him in the matter; a teacher at the school complained to the principal and said that, in light of the post, it would be difficult for her to continue to work with Tucker; the principal stated that 30 percent of the students at the school were African-American, and opined that the post would cause problems with the student disciplinary processes (as parents would have grounds to argue that Tucker was disciplining some students based upon their race); Atwater opined that the post disrupted operations by deteriorating the community's trust in the school system; several witnesses testified that they were concerned that, based on the views expressed in the post, Tucker would treat students differently based upon race; when asked if the post had any effect on the school, the assistant principal replied, "[n]ot directly. . . .But, indirectly, it has," referred to the student class change and added that the post had the "potential" to cause problems.

In its decision, the Board found that the post showed a "clear lack of judgment on the part of a public school teacher presently teaching African American students," that it created a "toxic atmosphere at the school," and that it "had the effect of undermining the trust" that students, their parents, and Tucker's colleagues had in her ability to effectively teach and mentor the students. The Board found "good and

6

sufficient cause" to suspend Tucker for five days and to require her to participate in diversity training.

Tucker filed the underlying complaint against Atwater, in his individual capacity and his official capacity as school superintendent, and Rutland, in her individual capacity and her official capacity as Board chairperson, seeking redress under 42 USC § 1983 for alleged violations of her right to free speech.[4] The trial court denied Atwater's and Rutland's motion for judgment on the pleadings or to dismiss, finding that they were not entitled to immunity and that Tucker had made a proper First Amendment challenge.

---

[4] 42 USC § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

A plaintiff in a § 1983 action must show (1) "that he has been deprived of a right secured by the constitution and laws of the United States, and [(2) that] the defendant acted under color of state law." *Poss v. Moreland*, 253 Ga. 730, 731 (324 SE2d 456) (1985) (punctuation omitted).

1. Atwater and Rutland contend that they are entitled to official immunity because their actions did not violate any clearly established law. We agree.

"The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity." *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001) (footnote omitted). Official immunity "gives government officials performing discretionary functions complete protection from individual claims brought pursuant to 42 USC § 1983, if their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Kline v. KDB, Inc.*, 295 Ga. App. 789, 793 (2) (673 SE2d 516) (2009) (citation omitted; emphasis supplied); *Board of Commissioners of Effingham County v. Farmer*, 228 Ga. App. 819, 824 (2) (493 SE2d 21) (1997). "Therefore, in order to succeed, the plaintiff in a civil rights [§ 1983] action has the burden of proving that a reasonable public official could not have believed that his or her actions were lawful in light of clearly established law." *Board of Commissioners of Effingham County*, supra at 823-824.

"The test for determining whether a defendant is protected from suit by the doctrine of qualified immunity is the objective reasonableness of the defendant's conduct as measured by reference to clearly established law; in this regard, a

8

reasonably competent public official should know the established law governing his conduct." *Gardner v. Rogers*, 224 Ga. App. 165, 167 (480 SE2d 217). "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Board of Commissioners of Effingham County*, supra at 824. Stated another way, "[u]nless a government agent's act is so obviously wrong . . . that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Maxwell v. Mayor & Alderman of the City of Savannah*, 226 Ga. App. 705, 707 (1) (487 SE2d 478) (1997) (citation omitted). "*In all but the most exceptional cases*, qualified immunity protects government officials performing discretionary functions from the burdens of civil trials and from liability for damages." *Board of Effingham County*, supra at 823 (emphasis supplied). The issue of immunity is a question of law and is reviewed de novo. *Pearce v. Tucker*, 299 Ga. 224, 227 (787 SE2d 749) (2016).

> Although the law is well-established that the [S]tate may not demote or discharge a public employee in retaliation for speech protected under the

[F]irst [A]mendment, a public employee's right to freedom of speech is not absolute. In *Pickering* [*v. Board of Education*, 391 U. S. 563 (88 SCt 1731, 88 SCt 1731) (1968)], the landmark case concerning a public employee's [F]irst [A]mendment rights, the Supreme Court held that a public employee's interests are limited by the [S]tate's need to preserve efficient governmental functions. The [S]tate has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the employee as a citizen, in commenting upon matters of public concern and the interest of the [S]tate, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Department of Corrections v. Derry*, 235 Ga. App. 622, 625 (3) (a) (510 SE2d 832) (1998) (footnote, citation and punctuation omitted); see *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1505 (11th Cir. 1990); *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (V) (A) (11th Cir. 1989).

In applying *Pickering*,

[a] four-stage analysis has evolved. First, the court must determine if the employee's speech may be fairly characterized as constituting speech on a matter of public concern. Second, if the speech addresses a matter of public concern, *the court must then conduct a balancing test in which it weighs the First Amendment interests of the employee against the*

*interest of the [S]tate, as an employer, in promoting the efficiency of the public services it performs through its employees*. Third, if the employee's claim survives the balancing test, the fact-finder must determine whether the employee's speech played a substantial part in the government's decision to discharge the employee. Finally, if the fact-finder determines that the employee's speech played a substantial part in the employee's discharge, the [S]tate must prove by a preponderance of the evidence that it would have discharged the employee even in the absence of the speech.

*Derry*, supra (footnote and punctuation omitted; emphasis supplied).

Assuming that Tucker made her post as a citizen and the post was a comment on a matter of public concern, the courts must "balance . . . the interests of [Tucker] as a citizen, in commenting upon matters of public concern and the interests of the [government] as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U. S. at 568 (II). In striking this balance, the courts consider whether the employee's speech impairs the ability of superiors to discipline subordinates, affects harmony among co-workers, impairs working relationships for which loyalty and confidence are necessary, or interferes with the operation of the government entity. *Rankin v. McPherson*, 483 U. S. 378, 388 (107 SCt 2891, 97 LE2d 315) (1987).

11

Government employers are permitted to take action against employees who engage in speech that "may unreasonably disrupt the efficient conduct of government operation[s]." *Tindal v. Montgomery County Commission*, 32 F.3d 1535, 1540 (III) (A) (11th Cir. 1994)). It has been recognized that where "close working relationships are essential to fulfilling public responsibilities, a wide degree of deference [is given] to the employer's judgment[.]" *Connick v. Myers*, 461 U. S. 138, 151-152 (II) (C) (103 SCt 1684, 75 LE2d 708) (1983).

In this case, Atwater and Rutland brought the disciplinary proceeding against Tucker for alleged violations of OCGA § 20-2-940 (a) (which permits the suspension of a teacher for specified reasons, including "good and sufficient cause") and Standard 10 (which sets forth standards for professional conduct for educators), asserting that her posting of the comment was disruptive to the school environment in which she taught and detailing the grounds for the disciplinary action. OCGA § 20-2-940 sets out the notice and procedural requirements for such disciplinary action, and there is no claim that the required procedures were not followed.

Here, there was evidence, recounted above, that Tucker's post interfered with the operation of the middle school where she taught. Although Tucker asserts that "there is no evidence that there was any *actual* disruption of the educational

12

environment as the result of Appellee's posts,"only "concern[s]" that the post could be disruptive, that assertion is belied by record evidence that the post did in fact affect the operations of the school.[5] Moreover, a government has discretion to restrict an employee's speech "that has *some potential* to affect the entity's operations." *Garcetti v. Ceballos*, 547 U. S. 410, 418 (II) (126 SCt 1951; 164 LE2d 689) (2006) (emphasis supplied).

As the Court acknowledged in *Garcetti*, "conducting these inquiries sometimes has proved difficult." *Garcetti*, supra. "This is the necessary product of 'the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors . . . to furnish grounds for [disciplinary action]." Id. (citation omitted). The instant case presents one of an

---

[5] Notably, the assertion in Tucker's brief that "both administrators who testified for the Appellants at the Board hearing testified that there was absolutely no interruption of school operations" materially misstates the administrators' testimony shown on the record pages she has cited.

We also note that Tucker's brief includes the following statement: "In fact, to this date, no student at Eighth Street Middle School has even voiced an objection to Appellee's posts; perhaps because they, too, are tired of dealing with thugs of all races who walk around with hoods over their heads, sagging pants and who commit random acts of violence." Tucker provides no citations to the record to support this statement. See Court of Appeals Rule 25; *Leone v. Green Tree Servicing, LLC*, 311 Ga. App. 702, 704 (1) (716 SE2d 720) (2011).

"enormous variety of fact situations," requiring a difficult inquiry, and there is no "bright-line" standard that would have put a reasonable employer on notice of a constitutional violation under these facts. See generally *Board of Commissioners of Effingham County*, supra at 824 (2). Tucker has pointed to no authority that put Atwater and Rutland on such notice under the circumstances presented in this case. Tucker bore the burden of proving an improper employer motive, but she has not met that burden. See *Heffernan v. City of Paterson, N. J.*, _ U. S. _ (136 SCt 1412, 1419; _ LE2d _) (2016).

Atwater and Rutland did not violate any clearly established law of which a reasonable person would have known. See *Harlow v. Fitzgerald*, 457 U. S. 800, 818 (102 SCt 2727; 73 LE2d 396) (1982); see also *Maxwell*, supra; *Dartland v. Metropolitan Dade County*, 866 F.2d 1322 (11th Cir. 1989). Because "pre-existing law [does not] dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that [taking disciplinary action against Tucker for her post] violates [the First Amendment] in the circumstances," the trial court erred in ruling that Atwater and Rutland were not entitled to official immunity. See *Board of Commissioners of Effingham County*, supra at 824 (2) (emphasis and citation omitted).

2. Atwater and Rutland were also entitled to judgment as a matter of law to the extent Tucker asserted claims against them in their official capacities.

> A local government such as the [c]ounty may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. This rule also applies to local government officials sued in their official capacities.

*Schroeder v. DeKalb County*, 341 Ga. App. 748, 754 (5) (b) (802 SE2d 277) (2017). Tucker did not allege facts that showed a government policy or custom of permitting a constitutional violation. See *Schroeder*, supra at 754-755 (5) (b) ("To establish the county's official policy [permitting a particular constitutional violation], [plaintiff] must identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county.").

Because Atwater and Rutland were entitled to judgment as a matter of law, the trial court erred by denying their motion. See *Harper v. Patterson*, 270 Ga. App. 437, 440 (2) (606 SE2d 887) (2004).

*Judgment reversed. Barnes, P. J., concurs. McMillian, J., concurs in judgment only.*

16